*1114 TEXTO COMPLETO DE LA SENTENCIA
El señor German Adams Maldonado (Adams) presenta ante este Tribunal una Apelación Criminal en la que solicita la revisión de la Sentencia dictada el 21 de febrero de 2008 por el Tribunal de Primera Instancia, Sala Superior de Ponce (TPI), mediante la cual se le declara culpable por asesinato atenuado y se le impone una condena de ocho (8) años de cárcel. Además, se le impone el pago de arancel contemplado en la Ley Núm. 183 de 29 de julio de 1998, 32 L.P.R.A. see. 3214.
Con el beneficio de la transcripción, los autos originales y la comparecencia de la Procuraduría General de Puerto Rico, este Tribunal procede a atender el recurso ante nuestra consideración.
I
Contra el señor Adams se presenta una Denuncia por asesinato en primer grado por hechos ocurridos el 4 de marzo de 2007 en los que se imputa que éste de forma ilegal, voluntaria, premeditada y criminalmente, dio muerte al señor Anthony Flores Pons, al infligirle dos puñaladas utilizando un arma blanca. Durante la vista de determinación de causa probable para arresto celebrada el 4 de marzo de 2007 se determina causa probable para arresto por asesinato atenuado. Posterior a ello, el Ministerio Público solicita la celebración de una vista de causa probable para arresto en alzada. La misma fue celebrada el 2 de mayo de 2007 y se determina causa probable para arresto por asesinato en segundo grado. Igualmente pesa contra el señor Adams una denuncia por infracción a la Ley de Armas por el uso y portación de arma blanca, 25 L.P.R.A. sec. 458d.
Luego de los procedimientos de rigor, celebrado el juicio y tras aquilatar la prueba, el TPI absuelve al señor Adams con relación al delito de infracción a la Ley de Armas y le haya culpable por el delito de asesinato atenuado.
La prueba presentada se resume de la siguiente manera. La prueba testifical del Ministerio Público consiste en el testimonio de José M. Oliver Franco (Oliver), Sgto. Rafael de Jesús Mercado (Sgto. de Jesús), Pedro Juan Rodríguez Hernández (Rodríguez), Anthony Flores Merced (Flores), Juan Girón Quiliquini (Girón), y la doctora Irma Rivera Diez (Dra. Rivera). Por su parte, la defensa presenta el testimonio del acusado.
Juan Alberto Girón Quiliquini
El señor Girón testifica que era amigo del difunto a quien conocía desde aproximadamente dos años. Indica que el 4 de marzo de 2007 a eso de las 4:14 de la mañana se encontraba en la Urbanización Caminos del Sur en Ponce, en casa de unas amistades viendo una pelea de boxeo en donde se encontraba el padre del difunto. El señor Girón indica que al finalizar la pelea, el señor Flores y él se montan en su guagua y que camino a donde iban se percatan que en la Pizzeria Monte Cario estaba la guagua del difunto, a quien apodaban Tony-Tony, y que el lugar estaba cerrando. El señor Girón indica que sin apagar la guagua se baja de ésta con el señor Flores. A su vez, señala que se pusieron [1] a hablar sobre la pelea, por lo que se dirige hacia su guagua para apagar la misma. El señor Girón señala que cuando iba de regreso hacia el local, no ve a Tony-Tony, lo busca con la vista y no lo ve por ninguna parte hasta que miró hacia el lado donde ubica Roger Electric y observa a Tony-Tony peleando con un individuo, [2] a quien identifica como el señor Adams. El señor Girón estaba más o menos a unos veinte pies de donde se encontraba Tony-Tony y el señor Adams.
El señor Girón testifica que pudo observar que el individuo estaba golpeando a Tony-Tony. El señor Girón indica que estaba a unos veinte pies de donde éstos se encontraban. A su vez, el señor Girón señala que observa que Tony-Tony se inclina hacia el frente, por lo que él decide acercarse al área para ver lo que estaba sucediendo cuando observa que Tony-Tony se endereza y el individuo sale corriendo mientras que Tony-Tony se le va detrás hacia la dirección del Gulf. El señor Girón declara que en ese momento no sabe lo que está pasando, no ve sangre y se va corriendo detrás de ellos cuando observa que Tony-Tony alcanza al individuo y lo golpea por la cabeza, lo *1115 tumba al piso y lo patea, mientras que él le grita qué es lo que pasa, salte, y en ese momento, Tony -Tony lo mira a los ojos y se desploma en el suelo.
El señor Girón declara que ante tal situación abofetea a Tony-Tony quien no reacciona, procede a darle respiración boca a boca, empieza a gritar pidiendo ayuda y observa sangre en el pecho en la parte izquierda superior'de la camisa de Tony-Tony, le levanta la camisa y entiende que observa dos puñaladas por el área del esternón y una por el lado derecho. Asimismo, el señor Girón relata que quien primero llega al área es el padre de Tony-Tony quien trata de tapar las heridas para que no siguieran botando sangre. A su vez, indica que el individuo se para del piso y comienza a correr hacia la Comandancia nueva que está al lado del Gulf.
El señor Girón testifica que se fue detrás del individuo para ver si lo podía coger y llegando a la Comandancia se percata de que está saliendo una patrulla y el individuo se sienta en el borde de la cuneta. Los oficiales se bajaron de la patrulla y él les indica que el individuo había apuñalado a un amigo. El individuo estaba indicando a los oficiales que le habían dado una pela entre varias personas a lo que el señor Girón replica que no era cierto. En ese momento, el Sgto. De Jesús arresta al individuo.
El señor Girón testifica que regresa a ver a Tony-Tony, pero no encuentra a nadie, sólo ve a unos oficiales de la policía y pregunta dónde estaba Tony-Tony a lo que le responden que fue llevado al Hospital Pila.
Durante el contrainterrogatorio, el señor Girón acepta que en ocasiones anteriores había indicado que Tony-Tony estaba forcejeando, además, indica que no observó nada en las manos del señor Adams. A su vez, indica que una vez el señor Adams está sentado en la cuneta puede observar que éste tiene una herida en su mano.
Anthony Flores Merced
El señor Flores declara que el día de los hechos se encontraba en la Pizzeria Monte Carlo a donde llegó en la guagua del señor Girón, luego de ver una pelea de boxeo. A su vez, indica que hablaron de la pelea. Asimismo, señala que escucha el nombre de su hijo, miró hacia el lado derecho, hacia Roger Electric, cuando ve que el señor Girón y su hijo se van corriendo detrás de una persona, por lo que él se va corriendo hacia ellos. El señor Flores indica que el señor Girón le señala que Tony-Tony estaba herido, que el señor Girón corrió detrás del individuo y que notó que Tony-Tony tenía dos heridas en el lado derecho debajo del pecho y trató de presionar para que no se desangrara. El señor Flores declara que luego llegó Tito [3] con su carro y llevaron a Tony-Tony al Hospital Pila. Además, indica que no vio cuándo le hicieron las heridas a su hijo ni si hubo una pelea, sólo vio a dos muchachos corriendo y que su hijo se desplomó al otro lado de la avenida. Tampoco vio cuando el señor Girón le dio respiración de boca a boca a Tony-Tony.
Pedro Juan Rodrí guez Hernández
Declara que es comerciante y que se apoda Tito, es el dueño de la Pizzeria Monte Cario, conocía a Tony-Tony desde hace diez (10) años. El día de los hechos indica que la gente estaba saliendo del negocio y él estaba cerrando el mismo, que se encontraban en el lugar el señor Girón, el señor Flores, Tony-Tony, dos o tres clientes. El señor Rodríguez indica que estaba de espalda a Roger Electric y cuando dio la vuelta observa a Tony-Tony al otro lado de la acera que estaba peleando con una persona y que en ese momento el señor Girón sale corriendo detrás de Tony-Tony, el señor Flores empieza a llamarlo, y Tony-Tony cae al suelo. El testigo indica que se monta en el carro y llega hasta donde estaba Tony-Tony. Asimismo, testifica que no observó que tuvieran nada en las manos.
Seto. Rafael de Jesús Mercado
El Sgto. de Jesús declara que para la fecha de los hechos estaba adscrito a la División de Tránsito y que sale *1116 en un vehículo Oficial rotulado y que se detuvo en el semáforo rojo cuando observa que venía un individuo [4] con las manos entrelazadas corriendo entre carriles, por lo que se queda observando al individuo a quien notó como una persona desesperada, como si estuviera asustado. El Sgto. de Jesús indica que detiene al individuo y nota que el hombre tenía sangre en la mano izquierda y en la ropa. A su vez, declara que el individuo se sentó en la orilla de la carretera y que le pregunta qué había pasado y el individuo le indica que le habían caído encima y que se fue huyendo para evitar que lo agredieran. El Sgto. de Jesús relata que como unos tres o cinco minutos más tarde se escucha por la radio que había una situación en la Pizzeria Monte Cario. Además, el Sgto. de Jesús observa que venía corriendo un joven alto y le señala al individuo como la persona que apuñala a la persona que estaba en la pizzeria, por lo que procede a hacer las advertencias y poner bajo arresto al individuo.
El Sgto. de Jesús aclara que no hizo una investigación de los incidentes, sino que prepara un informe a base de la información que le brinda el señor Girón y lo que le indica el médico que atiende a Tony-Tony quien le indica que éste había fallecido a causa de dos puñaladas con un objeto punzante. A su vez, el Sgto. de Jesús indica que no tiene el objeto punzante, ni hubo una descripción del mismo.
José M. Oliver Franco
El señor Oliver comunica por radio que había habido una agresión en el área de la Pizzeria Monte Cario y que al llegar al lugar de los hechos observa varias patrullas, una ambulancia y gente que le informa que habían apuñalado a un muchacho y custodia una bicicleta que le había informado le pertenecía al señor Adams. Además, indica que le dio conocimiento a la División de Homicidios e indica que quién hace la investigación es el Agte. Quirindongo. [5]
Doctora Irma Rivera Diez
La Dra. Rivera declara que realiza la autopsia de Tony-Tony, la cual consiste de un examen externo e interno del cadáver, muestras de toxicología y radiografías. La Dra. Rivera testifica que Tony-Tony recibe dos heridas de arma blanca, por ser heridas de borde liso, una localizada en el aspecto anterior y la otra en el área del pecho. La Dra. Rivera indica que la herida localizada en el aspecto anterior del hemotórax izquierdo midió una pulgada y media de longitud, posición horizontal con una trayectoria a través de la piel, tejidos subcutáneos, planos musculares, fracturado el esternón y la quinta costilla en el hemotórax izquierdo, penetra la cavidad toráxica y perfora el corazón a nivel de la pared del ventrículo derecho. La segunda herida localizada en el aspecto anterior del hemotórax izquierdo a nivel del rebol costal, tiene una longitud de una y tres cuarto de pulgada, con una trayectoria a través de la piel, tejidos subcutáneos, planos musculares y penetraba la cavidad abdominal, con laceración en el lóbulo del hígado. La Dra. Rivera concluye que la muerte de Tony-Tony fue producida por las heridas de arma blanca. No obstante, la Dra. Rivera no pudo identificar el tamaño del objeto que ocasiona las heridas ni cuán profunda fue la misma.
La Dra. Rivera manifiesta que del cuerpo de Tony-Tony, el examen toxicológico refleja .19% de alcohol en la sangre y en la orina .24% de alcohol. Además, la Dra. Rivera indica que en el análisis de sangre no se detectaron sustancias controladas, pero que en la prueba de hisopo nasal dio positivo a cocaína.
German Adams Maldonado
El señor Adams testifica que reside en Ponce y que tiene la edad de 48 años. Además, indica que vive en el mismo sector desde que tiene doce años. A su vez, señala que trabajaba en el Gulf, ha trabajado en Burger King, Meca Carwash y otros y que está pensionado por los nervios.
El señor Adams relata que está acusado por un asesinato que ocurrió mientras lo estaban golpeando unos individuos frente a la Pizzeria Monte Cario donde había un grupo de personas que estaban gritándole a cuanto *1117 carro podía pasar por allí y que él iba en su bicicleta a la cual se le salió la cadena, por lo que se para a arreglar la misma cuando vienen dos individuos [6] y se paran a su lado a preguntar qué le había pasado a lo que él contesta que nada y siguió arreglando la bicicleta, pero se descuida y ellos empezaron a darle golpes e incluso señala que le empujaron ocho dientes del frente con la patada que le dieron. Entonces, el dice que trata de soltarse y escucha cuando uno de ellos dice que va para el carro.
El señor Adams testifica que trata de levantarse, pero que Tony-Tony sigue dándole y que cuando va a pararse siente que lo cortan y entonces se tira al medio de la calle y siguió hasta el garaje. Luego, señala que el sargento le pregunta que hacia dónde va y él le contesta que para la comandancia porque dos muchachos le dieron varios golpes sin motivo alguno. Cuando abrió las manos salió la sangre y se sienta en el borde de la acera. El señor Adams indica que el policía llama a la ambulancia y en eso llega el señor Girón. Además, el señor Adams declara que le dieron los primeros auxilios, le pusieron las esposas y lo llevaron al Hospital San Lucas II.
El señor Adams indica que al hospital va el Agte. Quirindongo y le indica que mató a un muchacho, a lo que él responde que le estaban dando, y el señor Adams le pregunta “cómo que murió la otra persona
El señor Adams indica que iba a comprar cigarrillos y que ningún guardia le pregunta qué fue lo que ocurrió el día de los hechos, porque lo trataron de asesino rápido sin hacer investigación alguna. El señor Adams indica que es la primera vez que dice lo ocurrido. Asimismo, indica que no sabe de qué cuchillo se está hablando.
Posterior a ello, el Ministerio Público presenta el 16 de enero de 2008 una “Moción Solicitando Imposición de Agravantes ” mediante la cual expone que procede la imposición de la pena con agravantes debido a que el delito fue de violencia y se evidenciaron hechos de crueldad que tuvieron como resultado la muerte de un joven ejemplar; el señor Adams utiliza un arma en la comisión del delito, según se desprende de la prueba científica que establece que la causa de muerte fue heridas de arma blanca; y el señor Adams mintió durante el juicio bajo juramento. A tal solicitud replica el señor Adams al indicar que la prueba presentada demuestra que no procede la imposición de agravantes.
Así las cosas, el TPI celebra la vista para dictar Sentencia en la que la defensa argumenta que, luego de ver el Informe Pre-Sentencia, entiende que el señor Adams merece una libertad a prueba. Además, sostiene que procede una sentencia con atenuantes debido a que las circunstancias demuestran que la víctima del delito estaba peleando con su representado y dio positivo a cocaína y a alcohol en la sangre. Asimismo, el señor Adams argumenta que la comunidad lo describe como una persona de conducta respetuosa, laboriosa y tranquila, no lo relacionan con vicios prohibidos, ni conducta antisocial, ni malas amistades, ni lo consideran como peligroso. Por su parte, el Ministerio Público indica que procede la imposición de la pena con agravantes por no haberse aceptado la comisión del delito, el riesgo de comportamiento futuro, y la falta de seguridad, por lo que entiende que el señor Adams debe cumplir pena de reclusión.
Finalmente, luego de celebrada la vista para atenuantes y agravantes, y recibido el Informe pre-sentencia, [7] el TPI dicta la Sentencia de cárcel luego de celebrada la vista para atenuantes y agravantes, y acoge la solicitud del Ministerio Público para que la misma sea con agravantes. [8] A tales efectos, el foro de instancia señala que: (1) el delito fue uno violento y con grave daño corporal; (2) el señor Adams es un paciente de metadona; (3) existe información de que ha amenazado a la familia del occiso; (4) deambula durante el día; (5) tiene convicciones por delitos menos grave y acusaciones que fueron ventiladas en el Tribunal, aunque resultó absuelto; (6) hay evidencia de que fue usuario de heroína; y (7) se le considera peligroso para permanecer en la comunidad. Por tanto, el TPI entiende que el señor Adams no debe cumplir la pena en libertad a prueba y que tampoco es acreedor de la misma, por lo que lo sentencia a ocho (8) años de cárcel por el delito de asesinato atenuado.
*1118 II
Inconforme, el señor Adams presenta escrito de apelación ante este Tribunal en el que cuestiona la discreción del TPI al momento de dictar Sentencia, condenándole a ocho (8) años de cárcel cuando surge del Informe Pre-Sentencia y la prueba desfilada en el caso, que podía beneficiarse de una probatoria y/o sentencia suspendida. Además, el señor Adams cuestiona que se probara la culpabilidad más allá de toda duda razonable.
III
A. Prueba en la esfera penal
La presunción de inocencia es uno de los derechos fundamentales que le asiste a todo acusado de delito, el cual está consagrado en el Artículo II, Sección 11, de nuestra Constitución y por la Regla 110 de Procedimiento Criminal, 34 L.P.R.A. Ap. II, R. 110. La presunción de inocencia establece que toda persona es inocente hasta que se le pruebe lo contrario más allá de duda razonable.
La presunción de inocencia conlleva la obligación del Estado de presentar evidencia y cumplir con la carga de la prueba para establecer la culpabilidad del acusado. Es por ello que el Estado tiene la obligación de presentar prueba suficiente y satisfactoria sobre cada uno de los elementos del delito por el que se acusa a una persona. Cuando nos referimos a que el Estado tiene que presentar prueba suficiente y satisfactoria lo que implica es que el Estado, además de presentar prueba sobre los elementos del delito, tiene que presentar prueba que produzca certeza o convicción moral de que se cometió el delito por el acusado. Véase, Pueblo v. Irrizary, 156 D.P.R. 780, 786-787 (2002); Pueblo v. Rosaly Soto, 128 D.P.R. 729, 739 (1991); Pueblo v. Rodríguez Román, 128 D.P.R 121, 130-131 (1991); Pueblo v. Cabán Torres, 117 D.P.R. 645, 652-653 (1986).
Por lo anterior es que se ha consignado como un principio fundamental del sistema de derecho puertorriqueño que la culpabilidad de un imputado de delito debe ser probada más allá de duda razonable. Pueblo v. De León Martínez, 132 D.P.R. 746, 764 (1993). Este principio es cónsono con el principio de presunción de inocencia y es un elemento del debido proceso de ley en un procedimiento penal. /¿; Pueblo v. Cruz Granados, 116 D.P.R. 3, 24-25 (1984). Si la prueba desfilada por el Estado produce insatisfacción en el ánimo del juzgador, estamos ante una “duda razonable y fundada”. Pueblo v. Toro Rosas, 89 D.P.R. 169, 175 (1963); Pueblo v. Cabán Torres, supra, a la pág. 652. Claro está, ello de por sí sólo no significa que toda duda posible, especulativa o imaginaria tenga que ser destruida a los fines de establecer la culpabilidad del acusado con certeza matemática. Sólo se exige que la prueba establezca aquella certeza moral que convence y dirige la inteligencia y satisface la razón. Pueblo v. Pagán Ortiz, 130 D.P.R. 470, 480 (1992); Pueblo v. Blgio Pastrana, 116 D.P.R. 748, 760-761 (1985); Pueblo v. Cruz Granados, supra, a las págs. 21-22.
En casos criminales, la función revisora de este Tribunal consiste en evaluar si la culpabilidad del acusado fue probada más allá de duda razonable y si se probaron los elementos del delito por el qué se acusa a la persona. Para esto, es importante que analicemos la prueba presentada para determinar si la misma es satisfactoria y suficiente. Cuando hablamos de suficiencia evidenciaría nos referimos a determinar y asegurar de que cualquier manera en que se interprete la veracidad de la prueba presentada existe prueba que derrota la presunción de inocencia del acusado al establecer los elementos del delito y la conexión del acusado con éstos. Pueblo v. Colón Castillo, 140 D.P.R. 564, 581 (1996); Pueblo v. Ramos y Álvarez, 122 D.P.R. 287, 315-316 (1988); Pueblo v. Bigio Pastrana, supra, a las págs. 760-761. Hay que destacar que esto es distinto a evaluar la credibilidad de la prueba testifical presentada en la prueba de cargo.
En la evaluación de la prueba presentada ante el foro de instancia, rige la norma de gran deferencia al juzgador de instancia y de abstención de intervenir en etapa apelativa con las determinaciones hechas por el foro recurrido en ausencia de error manifiesto, prejuicio, parcialidad o pasión Pueblo v. Acevedo Estrada, 150 D.P.R. 84, 98-99 (2000); Pueblo v. Calderón Álvarez, 140 D.P.R. 627, 644 (1996); Pueblo v. Pellot Pérez, 121 D.P.R. 791, 806 (1988); Pueblo v. Rivero, Lugo y Almodóvar, 121 D.P.R. 454, 471-474 (1988). Ello, ante la *1119 innegable realidad de que el juzgador de los hechos en instancia es quien oye o ve declarar a los testigos y es quien, de ordinario, está en mejor posición para aquilatar la prueba testifical. Pueblo v. Cabán Torres, supra, a las págs. 653-654. Así, pues, a menos que existan los elementos antes mencionados y/o que la apreciación de la prueba se distancie de la realidad fáctica o ésta sea inherentemente imposible o increíble, este Tribunal deberá abstenerse de intervenir con la apreciación de la prueba hecha por el juzgador de los hechos. En otras palabras, las determinaciones que hace el juzgador de los hechos no deben ser descartadas arbitrariamente, ni tampoco deben sustituirse por el criterio del foro apelativo, a menos que de la prueba admitida surja que no existe base suficiente que apoye tal determinación. Pueblo v. Acevedo Estrada, supra, a la pág. 99.
B. Asesinato
El Nuevo Código Penal establece los grados de asesinato de la siguiente manera:

“Constituye asesinato en primer grado:

(a) Todo asesinato perpetrado por medio de veneno, acecho o tortura o con premeditación.

(b) Todo asesinato que se comete como consecuencia natural de la consumación o tentativa de algún delito de incendio agravado, agresión sexual, robo, escalamiento agravado, secuestro, secuestro de un menor, estrago, envenenamiento de aguas de uso público, agresión grave en su modalidad mutilante, fuga, maltrato intencional o abandono de un menor.

(c) Todo asesinato de un miembro de la Policía, guardia escolar, guardia o policía municipal, alguacil, fiscal, procurador de menores, procurador de familia especial para situaciones de maltrato, juez u oficial de custodia que se encuentre en el cumplimiento de su deber, cometido al consumar, intentar o encubrir un delito grave.

Toda otra muerte intencional de un ser humano constituye asesinato en segundo grado. ” 33 L.P.R.A. see. 4734.
Conforme a ello, se establecen cuatro modalidades de asesinato en primer grado: (1) asesinato premeditado; (2) asesinato perpetrado por medio de veneno, acecho o tortura; (3) asesinato estatutario; (4) el asesinato de un miembro del sistema de justicia criminal en sus funciones. Todo otra muerte intencional de un ser humano es asesinato en segundo grado. D. Nevares-Muñiz, Nuevo Código Penal de Puerto Rico, Edición 2004-2005, San Juan, Instituto para el Desarrollo del Derecho, Inc., 2004, a la pág. 134.
Con relación a los grados de asesinato, tanto el asesinato en primer grado como el de segundo grado implican la intención y ausencia de justa causa o excusa al ocasionar la muerte; sin embargo, la diferencia radica en que en el asesinato en primer grado se requiere de “premeditación”, mientras que en el asesinato en segundo grado, la muerte está ausente de este elemento de “premeditación” y tampoco existe un arrebato de cólera o de súbita tendencia en cuyo caso estamos ante un asesinato atenuado. Al referimos al elemento de “premeditación”, nos dirigimos a la definición esbozada en el Artículo 14 del Nuevo Código Penal que establece que la “premeditación” consiste en la “deliberación previa a la resolución de llevar a cabo el hecho luego de darle alguna consideración por un período de tiempo.” 33 L.P.R.A. see. 4642 (w). Es decir, en el asesinato en primer grado, la persona ha decidido matar a otra luego de darle alguna consideración. Ese lapso puede ser tan rápido como el pensamiento. Véase, Pueblo v. Rosario, 67 D.P.R. 371, 375 (1967); Pueblo v. Echevarría Rodríguez I, supra, a la pág. 368; Pueblo v. González Pagan, 120 D.P.R. 684, 689 (1988).
La “premeditación” constituye un elemento subjetivo que, de ordinario, tiende a probarse de las inferencias de los hechos admitidos en evidencia relacionados con la muerte de la persona. No obstante, cónsono con lo anterior, se han reconocido varias instancias en las que fácilmente se puede inferir la premeditación. A modo de *1120 ejemplo, podemos señalar: el acto de atacar a una persona con una arma mortífera, ya que, del uso de la misma, puede inferirse la intención de matar o causar daños cuya consecuencia probable es la muerte; atacar con una arma a una persona desarmada; dispararle a la víctima en más de una ocasión, a corta distancia y alcanzándola en la cara; dispararle a la víctima dos tiros con un arma de fuego y luego acercársele para dispararle tres veces más mientras le dice “para acabar contigo”; ultimar a balazos a la víctima luego de que ésta retrocediera y rogara para que no le disparara; cuando sin mediar palabras, el acusado le dispara a unos jóvenes y mata a uno de ellos; cuando sin mediar palabras, el acusado le dispara tres tiros a un policía que le ordenó detenerse; inferirle numerosas heridas punzantes a la víctima atacándola por la espalda; apuñalar al occiso mientras otro lo agarra. Pueblo v. Negrón Ayala, Opinión 1ro de junio de 2007, 171 D.P.R. _, 2007 J.T.S. 109; Pueblo v. Rivera Alicea, 125 D.P.R. 37, 45 (1989); Pueblo v. Caballero Rodríguez, 109 D.P.R. 126 (1979). En todos estos casos, estamos ante un asesinato en primer grado.
Por otra parte, el Art. 108 del Código Penal tipifica el asesinato atenuado de la siguiente manera:
“No obstante lo dispuesto en la see. 4735 de este título [Art. 107], cuando el asesinato tiene lugar en ocasión de súbita pendencia o arrebato de cólera, se impondrá al convicto la pena provista para el delito grave de tercer grado. ” Enfasis suplido. 33 L.P.R.A. see. 4736.
Los elementos de este delito son: (1) dar muerte a un ser humano; (2) como consecuencia de súbita pendencia o arrebato de cólera; y (3) causado por una provocación adecuada de la víctima. Pueblo v. Negrón, 171 D.P.R. _ (2007), 2007 J.T.S. 109, a la pág. 1574; Pueblo v. Rosario Orangel, 160 D.P.R. 522, 608 (2003). Es un acto intencional e ilegal por el cual ocurre una muerte, pero, por circunstancias atenuantes, la calificación del delito y la pena varían para beneficio del acusado. Pueblo v. Cruz Correa, 121 D.P.R. 270, 279 (1988); Pueblo v. Rivera Alicea, 125 D.P.R. 37 (1989); Pueblo v. Sulman, 103 D.P.R. 429, 442 (1975).
C. Agravantes
Por otra parte, en Puerto Rico existe un sistema de pena fija para los delitos en que se impusiere pena de reclusión conforme dispone el Artículo 65 del Código Penal, 33 L.P.R.A. see. 4693, mediante el cual se dicta la pena de reclusión establecida por ley para el delito, y de existir circunstancias atenuantes o agravantes, el Código Penal establece el modo en que se fijan las penas. Véase, 33 L.P.R.A. see. 4698, 4702.
La pena con relación al asesinato atenuado corresponde a la pena provista para el delito grave de tercer grado. 33 L.P.R.A. see. 4736. Es decir, una pena de reclusión por un término fijo en años naturales que no puede ser menor de tres (3) años un (1) día, ni mayor de ocho (8) años. 33 L.P.R.A. see. 4694 (c).
En cuanto a los atenuantes y agravantes, el Código Penal establece en sus Artículos 71 y 72 las circunstancias que se consideran como atenuantes y agravantes. Específicamente, se consideran circunstancias agravantes: (a) el historial delictivo que no se consideró para imputar reincidencia; (b) si el delito se comete mientras se disfrutaba de algún beneficio como sentencia suspendida, libertad bajo palabra, restricción terapéutica, entre otros; (c) si el convicto mintió en el juicio en su contra y no se le procesó por perjurio; (d) si el convicto amenazó a los testigos, los indujo a perjurio u obstaculizó el proceso judicial; (e) si el convicto se aprovechó indebidamente de la autoridad de un cargo o empleo; (f) si se cometió el delito útilizando un informe que lo identificaba como agente del orden público, o empleado de agencia gubernamental o entidad privada; (g) si se utilizó un menor o impedido para cometer el delito; (h) si se indujo o influyó a los demás partícipes en el hecho delictivo; (i) si se realizó el hecho delictivo a cambio de dinero o compensación alguna; (j) si el convicto planificó el hecho delictivo; (k) si se utilizó un arma de fuego o algún instrumento, objeto o método peligroso o dañino para la vida, integridad corporal o salud de la víctima; (1) si se causó grave daño corporal; (m) si el convicto abusó de su superioridad física respecto a la víctima y le produjo deliberadamente un sufrimiento mayor; (n) si la víctima del delito era particularmente vulnerable, ya sea porque era menor de edad, *1121 incapacitado o de edad avanzada; (o) si el delito cometido fue de violencia y su comisión revela crueldad y desprecio contra la víctima; (p) si el delito se comete en un edificio público; y (q) si el delito fue cometido motivado por prejuicio hacia y contra la víctima por las razones contempladas por el Código Penal. 33 L.P.R.A. see. 4700. Véase, además, Regla 171 de Procedimiento Criminal, 34 L.P.R.A. Ap. II, R. 171.
Por su parte, el Código Penal establece las circunstancias atenuantes entre las cuales están las siguientes: (a) causas de exclusión de responsabilidad penal cuando no concurran todos los requisitos para eximir; (b) no hay antecedentes penales; (c) el convicto observó buena conducta con anterioridad al hecho y goza de reputación satisfactoria en la comunidad; (d) la temprana edad del convicto; (e) la condición mental o física del convicto; (f) el convicto aceptó su responsabilidad; (g) cooperó voluntariamente en el esclarecimiento del delito; (h) restituyó a la víctima el daño causado o disminuyó el mismo; (i) trató de evitar el daño; (j) la víctima provocó el hecho o se produjo por su descuido; (k) el convicto fue inducido por otros a participar en el incidente; (1) realizó el hecho por causas o estímulos tan poderosos que lo indujeron a arrebato, obcecación u otro estado emocional similar; (m) la participación del convicto no fue por sí sola determinante para causar el daño o peligro que provocó el hecho; y (n) el daño causado fue mínimo. 33 L.P.R.A. see. 4699. Véase, además, Regla 171 de Procedimiento Criminal, supra.
A su vez, el Código Penal establece que para la fijación de las penas se observarán las siguientes reglas:

“(a) Cuando no concurran circunstancias atenuantes ni agravantes, o cuando concurran unas y otras, se seleccionará la pena mediana del intervalo de pena señalado en este Código para el delito, tomando en consideración las circunstancias personales del convicto, las necesidades de prevención y la mayor o menor gravedad del hecho.

(b) Cuando concurran una o varias circunstancias agravantes, se seleccionará la pena de la mitad superior del intervalo de pena establecido por este Código para el delito.

(c) Cuando concurran dos o más circunstancias atenuantes o una sola, pero que el juez estime de peso, se seleccionará la pena en la mitad inferior del intervalo de la pena establecida por este Código para el delito. ” 33 L.P.R.A. see. 4702
No obstante, es importante recalcar que al momento de imponer la pena y dictar sentencia, el tribunal tiene amplia discreción para disponer lo que proceda en derecho. El Tribunal Supremo ha resuelto que normalmente los tribunales apelativos no intervendremos con el ejercicio de la discreción del tribunal de instancia en la imposición de la pena, salvo en los casos de claro abuso de discreción. Pueblo v. Rodríguez Santana, 146 D.P. R. 860, 888-889 (1998); Pueblo v. Chévere Heredia, 139 D.P.R. 1, 21 (1995); Pueblo v. Narváez Narváez, 122 D.P.R. 80, 92-93 (1988).
D. Lev de Sentencias Suspendidas y Libertad a Prueba
Por último, la Ley de Sentencia Suspendida y Libertad a Prueba, Ley Núm. 259 de 3 de abril de 1946, según enmendada, 34 L.P.R.A. see. 1026, et seq. (Ley de Sentencias Suspendidas) establece un sistema mediante el cual se le confiere a un convicto la oportunidad de cumplir su sentencia, o parte de ella, fuera de las instituciones carcelarias, siempre y cuando éste observe buena conducta y cumpla con todas las restricciones que el tribunal le imponga. Pueblo v. Negrón Caldero, 157 D.P.R. 413, 417-418 (2002); Pueblo v. Zayas Rodríguez, 147 D.P.R. 530, 535-536 (1999).
El propósito del mecanismo de la sentencia suspendida es lograr que un convicto de delito pueda vivir una vida productiva en sociedad alejado del trasiego delictivo en un sistema de supervisión a la vez que ello representa una economía sustancial para el Estado y evita el hacinamiento en las instituciones correccionales del *1122 país.
El disfrute de una sentencia suspendida es un privilegio y no un derecho. Pueblo v. Negrón Caldero, supra, a la pág. 418; Pueblo v. Zayas Rodríguez, supra, a la pág. 536; Pueblo v. Molina Virola, 141 D.P.R. 713, 719 (1996); Pueblo v. Torres Rivera, 137 D.P.R. 630, 642-643 (1994); Pueblo v. Rivera, 79 D.P.R. 880, 881 (1957). La decisión de conceder o denegar los beneficios de una sentencia suspendida es una determinación que descansa esencialmente en la discreción del tribunal sentenciador. Pueblo v. Zayas Rodríguez, supra, a la pág. 536; Pueblo v. Molina Virola, supra; Pueblo v. Ortega Santiago, 125 D.P.R. 203, 210 (1990). A ésta le cobija una presunción de corrección. Unicamente en circunstancias que apunten a un abuso de ella o arbitrariedad es que habremos de intervenir. Pueblo v. Ortega Santiago, supra, a la pág. 212; Pueblo v. Torres Rivera, supra, a las págs. 642-643; Pueblo v. Vázquez Caraballo, 114 D.P.R. 272, 275 (1982); Pueblo v. Pérez Bernard, 99 D.P. R. 834, 839 (1971).
La Ley de Sentencias Suspendidas faculta al TPI para suspender los efectos de una sentencia en reclusión en todo caso de delito grave y en todo caso de delito menos grave que no fueren delitos cuya clasificación es de primer grado o segundo grado, según dispone el Nuevo Código Penal. Además, la Ley de Sentencias Suspendidas contempla una serie de circunstancias en las cuales tampoco el tribunal podrá suspender los efectos de una sentencia en reclusión. 34 L.P.R.A. see. 1027. Establecido que el delito por el cual resulta convicta una persona puede recibir los beneficios de una sentencia suspendida, resulta necesario que concurran los siguientes requisitos para que dicha persona sea acreedora del beneficio de sentencia suspendida:

‘‘[y] ordenará que la persona sentenciada quede en libertad a prueba siempre que al tiempo de imponer dicha sentencia concurran todos los requisitos que a continuación se enumeran:

(1) Que dicha persona, con anterioridad a la fecha en que se intente suspender la sentencia dictada, no hubiera sido convicta, sentenciada y recluida en prisión por delito grave alguno con anterioridad a la comisión del delito por el cual fuere procesada, y a la cual no se hubieren suspendido los efectos de una sentencia anterior por delito grave;

(2) que las circunstancias en que se cometió el delito no evidencien que existe en el autor del mismo un problema de conducta o de carácter para cuya solución favorable, en interés de la debida protección de la comunidad, se requiera la reclusión de dicha persona en alguna de las instituciones penales de Puerto Rico;

(3) que el juez sentenciador tenga ante sí un informe que le haya sido rendido por el Administrador de Corrección después de este último haber practicado una investigación minuciosa de los antecedentes de familia e historial social de la persona sentenciada, y que, del contenido de ese informe, pueda dicho juez sentenciador concluir que ningún aspecto de la vida de esa persona evidencia que haya necesidad de que se le recluya en alguna de las instituciones penales de Puerto Rico para que se logre la reforma o rehabilitación que para ella persigue la ley como medida de protección adecuada a la comunidad. El tribunal sentenciador podrá, a su discreción, además de poner a prueba a la persona sentenciada, imponer una multa cuya cuantía quedará a discreción del tribunal. Disponiéndose, además, que la persona puesta a prueba podrá ser requerida para que, mientras estuviere en libertad a prueba, resarza a la parte perjudicada de los daños que le hubiere ocasionado o para que asuma la obligación de corregir el mal causado por su acto delictivo. Disponiéndose, además, que una vez puesta a prueba, la persona quedará bajo la custodia legal del tribunal hasta la expiración del período fijado en su sentencia, y

(4) que en los casos en que se tiene la obligación de pagar una pensión alimentaria, dicha persona haya cumplido con su obligación de hacer los pagos o esté acogido a un plan de pagos y esté cumpliendo con el mismo. ” (Énfasis suplido) 34 L.P.R.A. see. 1027.
*1123 En todo delito grave, excepción hecha en los casos de asesinato en primer grado cuya pena es única y mandatoria, el Tribunal, antes de dictar sentencia, deberá tener ante sí un informe pre-sentencia. Lo anterior es una valiosísima herramienta que le permite al tribunal emitir una sentencia razonable y adecuada dentro de los parámetros establecidos por la propia ley. El informe del oficial socio-penal y su correspondiente recomendación no ata ni obliga al tribunal. Pueblo v. Ortega Santiago, supra, a la pág. 210.
Para ello "hay que analizar y determinar si la persona específica ante el tribunal que reclama la concesión del privilegio es acreedor o no al mismo; ello de acuerdo a las virtudes y defectos que esa persona posea". Pueblo v. Ortega Santiago, supra, a la pág. 216. Lo anterior se determinará tomando en consideración los criterios previamente señalados al citar el Artículo 2 de la Ley de Sentencias Suspendidas, es decir, que la persona no tenga antecedentes penales que la descualifiquen; que las circunstancias en que se cometió el delito no evidencien un problema de conducta que apunten a un peligro a la sociedad que requiera el ingreso del convicto a una institución penal; y que el juez tenga un informe que recoja el historial personal, familiar y social del convicto que le permita concluir que éste puede estar en la libre comunidad sin que ello suponga un riesgo para ésta, a la misma vez que se logra la rehabilitación del convicto.
No basta que se cumpla alguno de los requisitos, se tienen que cumplir todos. Pueblo v. Vega Vélez, 125 D.P.R. 188, 199-200 (1990). El hecho de que el convicto no tenga antecedentes penales, sin más, no le hace acreedor a recibir los beneficios de una sentencia suspendida. Tan es así que aun en casos de alegaciones de culpabilidad, no hay nada que impida que el juez de instancia examine el expediente fiscal con el propósito de conocer los hechos que dieron lugar a la presentación de cargos criminales, y así poder estar en mejor posición de ejercer esa discreción.
Reiteramos, la determinación de conceder o no los beneficios de una sentencia suspendida en un acto inminentemente discrecional del juez y ésta "está inexorable e indefectiblemente atada al concepto de la razonabilidad". Pueblo v. Ortega Santiago, supra. El abuso de discreción se puede manifestar de varias maneras en el ámbito judicial. Se incurre en abuso, entre otras cosas y en lo pertinente, cuando el juez, en la decisión que emite, no toma en cuenta e ignora sin fundamento para ello un hecho material importante que no podía ser pasado por alto; cuando, por el contrario, el juez, sin justificación y fundamento alguno para ello, le concede gran peso y valor a un hecho irrelevante e inmaterial y basa su decisión exclusivamente en el mismo; o cuando, no obstante considerar y tomar en cuenta todos los hechos materiales e importantes y descartar los irrelevantes, el juez livianamente sopesa y calibra los mismos. Pueblo v. Ortega Santiago, supra, a la pág. 212.
IV
En el caso ante nos, el señor Adams plantea que el TPI erra al encontrarle culpable por el delito de asesinato atenuado el cual conlleva una pena de delito grave de tercer grado, es decir, la pena equivale a tres (3) años y un (1) día hasta ocho (8) años, y el intervalo medio de la pena es de cinco y medio (5.5) años. Para ello señala que los hechos presentados por el Ministerio Público no fueron concluyentes y que la prueba en su contra fue insuficiente e insatisfactoria en derecho. A su vez, el señor Adams cuestiona la pena que le fuera impuesta con agravantes y que no se hubiera entendido que es merecedor de los beneficios de una Sentencia Suspendida. Veamos.
En primer lugar, nos corresponde atender el planteamiento del señor Adams a los efectos de que se le encontrara culpable más allá de duda razonable por el delito de asesinato atenuado. Luego de analizar la prueba presentada, este Tribunal concluye que el error no fue cometido.
La prueba presentada demuestra que Tony-Tony fallece el 4 de marzo de 2007 como consecuencia de dos heridas punzantes, una en el área del pecho y otra en el aspecto anterior del hemotórax izquierdo. La prueba desfilada ubica al fenecido en la Pizzeria Monte Cario en compañía de amistades a donde llegan el señor Girón y el señor Flores. Asimismo, el testimonio del señor Girón ubica a Tony-Tony y al señor Adams peleando *1124 minutos antes de que éstos corrieran hacia el otro lado de la carretera y que Tony-Tony se desplomara. La prueba aquilatada demuestra que una vez Tony-Tony se desploma, se advierte que éste está sangrando, por lo que es llevado por el señor Rodríguez y el señor Flores al hospital donde fallece. Asimismo, los testimonios ofrecidos ante el TPI concuerdan en cuanto a los detalles del lugar y el hecho irrefutable que el señor Adams y Tony-Tony estaban peleando en el área de Roger Electric. Igualmente, el testimonio del Sgto. de Jesús ubica al acusado en la escena tal y como lo indican las demás declaraciones e incluso señala que éste tenía sangre en su ropa y en sus manos. Por su parte, el señor Adams señala que fue objeto de una golpiza que le diera el fenecido.
A base de las declaraciones de los testigos y la prueba aquilatada por el TPI, este Tribunal concluye que el error señalado no fue cometido. El Ministerio Público establece los elementos del delito de asesinato atenuado consistentes en dar muerte a un ser humano como consecuencia de súbita pendencia o arrebato de cólera causado por la provocación de la víctima mediante evidencia circunstancial, es decir, con aquella evidencia que tienda a demostrar el hecho en controversia probando otro distinto, del cual -en unión a otros hechos ya establecidos-, pueda hacerse una inferencia razonable que, a su vez, permita hacer una determinación conclusiva de cuáles son los hechos ciertos del caso. Veáse, Regla 10(H) de Evidencia, 32 L.P.R.A. Ap. IV, R. 10(H); Chévere Mouríño v. Levis Goldstein, 152 D.P.R. 492 (2000); Colón y otros v. K-Mart y otros, 154 D.P.R. 510 (2001), 2001 J.T.S. 98.
Por otro parte, un examen de la transcripción de los procedimientos ante el TPI, el informe pre-sentencia y los documentos que obran en autos, revelan que el foro de instancia tuvo ante su consideración circunstancias atenuantes y agravantes con relación a los hechos que dieron lugar al asesinato atenuado por el cual resulta convicto el señor Adams. [9]
Entre las circunstancias atenuantes se encuentra el que el convicto no tiene antecedentes penales, goza de reputación satisfactoria en la comunidad, en el estudio de cernimiento de nivel riesgo se clasificó con una puntuación de bajo riesgo en la escala de medición y padece de una condición mental. [10] En cuanto a las circunstancias agravantes, surge que los padres de la víctima informan que el convicto los ha amenazado; causó grave daño corporal a la víctima ai causar la muerte de éste, y la División de Homicidios de la Policía de Puerto Rico le considera peligroso en la comunidad. [11]
Ante tal situación procede considerar las disposiciones del Código Penal relativas a la fijación de la pena. En lo particular, en cuanto a la fijación de las penas, el Código Penal de 2004 establece cómo se impondrán las mismas, según haya circunstancias atenuantes o agravantes. A tales efectos, el Artículo 74(a) del Código Penal, 33 L.P.R.A. see. 4702, dispone que cuando no concurran circunstancias atenuantes ni agravantes, o cuando concurran unas y otras, se seleccionará la pena mediana del intervalo de pena correspondiente al delito, en este caso, cinco años y medio. Aunque, ciertamente, la norma ha sido que este Tribunal no intervendrá en el ejercicio de discreción del tribunal de instancia en la imposición de pena, ello no aplica cuando hubo un abuso de discreción como ha sucedido en el caso de autos. A tales efectos, vemos que existe clara directriz del Código Penal a los efectos de que en estos casos se establecerá la pena que corresponde a la mediana del intervalo cuando hay atenuantes y agravantes, como en el caso de autos; el TPI erró al imponer la pena con agravantes de ocho (8) años, ya que debió imponer la pena que corresponde a la pena mediana del intervalo.
En cuanto a si erró el foro de instancia al no conceder el beneficio de sentencia suspendida, entendemos que el TPI actuó correctamente. Como surge de las expresiones del foro de instancia, al momento de dictar la Sentencia, se consideró lo siguiente: (1) el señor Adams es usuario de metadona; (2) la información de que ha amenazado a los familiares de la víctima; (3) el señor Adams deambula durante el día; (4) ha tenido casos ante el tribunal por delitos menos graves en los que ha resultado absuelto; (5) existe evidencia de que fue usuario de heroína; y (6) se le considera peligroso para la comunidad. [12] Como hemos examinado, el TPI tiene amplia discreción para conceder el beneficio de sentencia suspendida y la determinación que se haga a tales efectos está cobijada con una presunción de corrección en la que sólo intervendremos cuando exista un abuso o *1125 arbitrariedad. Además, la persona debe cumplir con todos los requisitos que impone la Ley de Sentencias Suspendidas para hacer acreedora a tal beneficio.
En el caso de marras, entendemos que el TPI no abusa de su discreción al concluir que el señor Adams no era acreedor de este beneficio. De lo antes establecido, surge que el foro de instancia consideró la información suministrada del informe pre-sentencia y concluyó que existe la necesidad de que el señor Adams fuera recluido. Al examinar la ponderación de los hechos considerados por el foro de instancia, concluimos que no abusó de su discreción, por lo que no intervendremos con tal determinación.
V
Por los fundamentos antes expresados, se modifica la Sentencia dictada contra el señor Adams, a los únicos efectos de que la pena de cárcel sea conforme dispone el Código Penal para cuando convergen circunstancias agravantes y atenuantes. Por ende, se devuelve el caso al Tribunal de Primera Instancia para que dicte la Sentencia contra el señor Adams conforme con lo aquí resuelto.
Lo acordó y manda el Tribunal y lo certifica la señora Secretaria del Tribunal.
María Elena Pérez Ortiz Secretaria del Tribunal de Apelaciones
ESCOLIOS 2009 DTA 61

1. El señor Girón declara que estaban los dueños de la pizzeria, un vecino, Tony-Tony, el señor Flores, dos empleadas de la pizzeria y él.

2. El señor Girón describe al individuo como de 5’8”, tez no blanca ni negra, más o menos trigueño, pantalón largo.

3. Ese apodo corresponde al señor Pedro Juan Rodríguez Hernández.

4. El individuo al que hace referencia es el señor Adams.

5. El Ministerio Fiscal renuncia al testimonio del Agte. Quirindongo y lo pone a disposición de la defensa.

6. A uno lo identifica como el señor Girón y al otro como Tony-Tony.

7. Del Informe surgen circunstancias atenuantes y agravantes conforme al estado de derecho vigente.

8. En la referida vista, el Ministerio Público solicita agravantes por haber sido un delito de violencia con grave daño corporal, utilizar un arma en la comisión del delito, haber mentido durante-el juicio, no aceptar la comisión de delito, historial delictivo y representar riesgo futuro. Por su parte, la defensa argumenta que de los hechos de desprende que la víctima provocó el hecho, el acusado goza de buena conducta y reputación en la comunidad, y no se le considera peligroso.

9. De la prueba presentada ante el TPI no existe prueba alguna con relación a qué motivó los hechos del caso que terminaron con la muerte de un joven. La prueba presentada sólo estableció que la víctima y el convicto estuvieron peleando, el convicto salió corriendo y la víctima se va detrás de él, lo golpea y eventualmente se desploma por unas heridas sangrantes que le ocasionan la muerte. Igualmente, surge que el convicto corre hacia el área de la comandancia y que un agente al verlo correr agarrándose las manos (presentaba una herida cortante en sus manos) lo detiene para preguntar qué había pasado a lo que éste le contesta que lo estaban golpeando.

10. Nótese que el convicto hizo todas las gestiones y autorizó al personal investigativo para que tuviera acceso a la información médica en cuanto al tratamiento que recibe por su condición mental.

11. Notamos que el Código Penal expresamente dispone que las circunstancias agravantes o atenuantes que la ley ya haya *1126 tenido en cuenta al tipificar el delito, al igual que las que son inherentes al mismo, no serán consideradas en la fijación de la pena. 33 L.P.R.A. see. 4701. Por lo que es importante destacar que el delito por el cual fue hallado culpable el señor Adams es el de asesinato atenuado que conlleva el asesinato en ocasión de súbita pendencia o arrebato de cólera. 33 L.P.R. A. see. 4736.

12. El Juez considera la información que surge del Informe Pre-Sentencia suministrada por la División de Homicidios de la Policía de Puerto Rico sin mencionar la información que surge del referido Informe con relación a los miembros de la comunidad del señor Adams que no le consideran como uno peligroso.